Matthew M. Levy, J.
This is an action to recover the sum of $65,000, expenses incurred for the services rendered by the law firm of Lord, Day & Lord at the request and on behalf of the plaintiffs, in consequence of a disclaimer[1] by the defendant of a professional engineers’ liability policy. Therein the defendant insured the plaintiffs against any acts of their negligence in an amount not exceeding $500,000 and the defendant further undertook to defend the plaintiffs with respect to any suit against the plaintiffs in which damages were sought on account of their alleged negligence during the policy period.
It is this latter aspect, commonly characterized as the insurance company’s “duty to defend”, that is the substantive gravamen of the instant litigation. The basic question is, Was there such a duty here in respect of each of the several separate phases of the controversy? And, as a corollary, at and to what point of time were the assured legally justified in retaining counsel to protect their interests, and in charging the cost thereof to the insurance company? And, further, what effect, if any, on the right and measure of recovery, if any, was the fact that the services involved were also- rendered by the attorneys to defend the insurance company’s action to *331 rescind the policy? There is no question in this case as to the defendant’s obligation under the policy to pay the sums that might have been recovered against the plaintiffs by those whose person or property was damaged as a result of the plaintiffs’ operations.
The critical provisions of the insurance contract involved follow:
“II Defense, Settlement, Supplementary Payments
“ With respect to such insurance as is afforded by this policy, the company shall:
“ (a) defend any suit or arbitration proceeding against the insured which alleges any act of negligence, error, mistake or omission and seeks damages on account thereof, even if such suit is groundless, false or fraudulent * * *
“ (4) reimburse the insured for all reasonable expenses * * * incurred at the company’s request”.
Condition 3 of the policy provides that: “If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.”
An examination of the factual developments leading to the instant action is now in order.
Sometime during the year of 1953, the plaintiffs, a firm of consulting engineers and landscape architects, entered into an agreement with the State of New York, through the Department of Public Works, whereunder they prepared plans and specifications covering the construction of a section of the Sprain Brook Parkway in the City of Yonkers, New York. Thereafter, in December, 1958, a further agreement was executed with the State in which the plaintiffs undertook to supervise construction of the parkway. Both of these agreements contained provisions wherein the plaintiffs stipulated to “ indemnify and save harmless the State ” from any damage resulting from the plaintiffs’ negligence. The construction work was awarded by the State to Poirier & McLane Corporation as general contractors, who, in turn, subcontracted the pile-driving operation to Raymond International, Inc.
Commencing on July 24, 1959, and ending on September 27, 1960, Bronxville Palmer, Ltd., an owner of a building in the City of Yonkers known as the Winchester Apartments, filed in the Court of Claims a series of seven claims for damages against the State of New York and the Taconic State Park Commission, grounded on appropriation, trespass, negligence and water damage alleged to have been caused in connection with the construction of the parkway. Bronxville demanded *332 damages aggregating some $24,000,000, resulting from the driving of piles into its land and in close proximity to its building.
By letter of February 20, 1961, the Attorney-General of the State, on behalf of the State, wrote the plaintiffs that “We will expect you to indemnify and reimburse the State and Park Commission for any liability arising by virtue of any error or omission in design, inspection or supervision and hereby formally call upon you to do so.
“We therefore enclose a copy of each of the above claims to vouch in your firm and invite you to defend them, or such portions as you may desire.”
Upon receiving this communication, the plaintiffs advised the defendant of its contents, delivered a copy thereof to the defendant, together with copies of the documents referred to, and requested the defendant to represent the plaintiffs and to defend their interests in connection with the matters encompassed therein. Having “heard rumblings ” that the defendant would repudiate the policy, the plaintiffs conferred with their own counsel, Messrs. Lord, Day & Lord, who were formally retained on March 23, 1961. The defendant requested of the plaintiffs time within which to study the matter and to evaluate its obligation in this regard under the contract of insurance. Finally, on June 30, 1961, the defendant advised the plaintiffs that it disclaimed all obligations under the policy, and that it had instructed its attorneys to commence an action to rescind the same, upon the ground, as asserted by the defendant, that there was fraud by the plaintiffs in inducing the defendant to issue the policy. The defendant did not refuse to protect the plaintiffs upon the basis that no “ suit” had been commenced against them in the Court of Claims.
The defendant alleged in the rescission suit that, in applying for the insurance, the plaintiffs were required to answer the following question:
“ Question 10 — Is the applicant aware of any circumstances which may result in any claim against him, his predecessors in business, or any of the present or past partners or officers? If so, please give full particulars.” The plaintiffs answered in the negative. The insurer contended that the fact was that the plaintiffs had knowledge and notice that Bronxville had complained of vibration damage to its building; that thereafter Bronxville instituted its claims in the Court of Claims (wherein the plaintiffs were subsequently “ vouched in ”); and, as next set forth, commenced the action in the Supreme Court, Westchester County (wherein the plaintiffs were subsequently impleaded). Thus it is that, as contended by the defendant *333 herein, the basis for the plaintiffs’ defense against the suits in both courts was, in important respects, the same as the basis for the plaintiffs’ defense to the action against them for rescission.
In the meanwhile and in March, 1960, Bronxville had commenced an action in the Supreme Court, County of Westchester, against Poirier, the prime contractor, and against Raymond, the pile-driving subcontractor, seeking damages in the amount of $12,400,000. On July 31, 1961, Poirier impleaded the plaintiffs in that action as third-party defendants. On August 3, 1961, the plaintiffs requested the defendant to represent them and to defend their interests as third-party defendants in that Supreme Court action, which, again, they declined to do. At about that time, the defendant instituted a suit in the Supreme Court to rescind the contract of insurance. This rescission action was later dismissed on the merits after trial; judgment accordingly was entered in favor of the defendants therein (the plaintiffs herein) on July 19, 1963; and thereafter there was affirmance thereof in Fidelity & Cas. Co. of N. Y. v. Clarke (22 A D 2d 761) and leave to appeal to the Court of Appeals was denied (15 N Y 2d 484).
VOUCHING-IN AS A GENERAL TECHNIQUE COMPARED TO IMPLEADER.
As I view the basic issue involved in the first aspect of this case — whether the plaintiffs were entitled to the defensive protection provided for in the policy in the event there were a “ suit” against them — I do not see that it makes a vital difference whether there was a true “ vouching-in ” of them by the State or whether there was not. Nevertheless, I find it necessary, in order to clarify the issue, to discuss the nature and meaning of the process of vouching-in. I shall, therefore, consider first the effect of the letter of February 20, 1961, from the Attorney-General to the plaintiffs — i.e., does it actually vouch them into the actions against the State instituted by Bronxville in the Court of Claims? And second, if that be so or not, whether it is tantamount to a “ suit ” against the plaintiffs which the defendant was obligated to defend under the terms of the policy?
The essentials of vouching in were thus succinctly stated by the Court of Appeals in Hartford Acc. & Ind. Co. v. First Nat. Bank & Trust Co. of Hudson (281 N. Y. 162, 168): “A named defendant who would have another (not yet a party) bound by judgment in an action must by proper notice offer to him control of the defense of the litigation ”; and, also in Hartford *334 Accident, the court expressed “ A generally accepted statement of the rule ”, as “abridged”, in the following fashion (pp. 167-168): “ When a person is responsible over to another, either by operation by law or by express contract * * * and he is duly notified of the pendency of the suit and requested to take upon him the defense of it, he is no longer regarded as a stranger, because he has the right to appear and defend the action, and has the same means and advantages of controverting the claim as if he was the real and nominal party upon the record. In every such case, if due notice is given to such person, the judgment, if obtained without fraud or collusion, * # * will be conclusive against him, whether he has appeared or not.”
The Hartford Accident case was decided at nisi prius by Mr. Justice Bbrgau, now Associate Judge of the 'Court of Appeals. His decision was reversed in the Appellate Division by a divided court (256 App. Div. 30), but unanimously sustained in the Court of Appeals (281 N. Y. 162). In the course of his opinion, the learned trial court stated the rule as follows (162 Misc. 348, 354): “ One who is liable over for a claim made in an action to which he is not a party may be bound by the adjudication made in respect of that claim, where he has notice of the claim made, and a fair opportunity to participate in the trial”, citing, among other cases, Oceanic Steam Nav. Co. v. Campania Transatlantica Espanola (144 N. Y. 663); Village of Port Jervis v. First Nat. Bank of Port Jervis (96 N. Y. 550).
Judge Bergau indicated, at pages 354, 355 and 356, that “ this rule * * * is in principle based upon the doctrine of reS judicata * * * [and] also rests upon the doctrine of estoppel ”; and he stated that the “ procedure [of impleader, under the then subdivision 2 of section 193 of the Civil Practice Act] which was not available to defendants during the period that the doctrine of estoppel by notice was developed, offers a far more adequate remedy to defendants and a more certain protection to those sought to be bound and estopped by the adjudication, than the nebulous practice of giving notice of the nature of the claim and offering an opportunity to defend. The rule, which surely must have been uncertain and unsatisfactory, arose from necessity and from limitations of procedure. Modern practice has devised án adequate and certain remedy which would seem to be an exclusive substitute for the former procedure.”
Also citing the early cases of Oceanic Steam Nav. Co. v. Campania Transatlantica Espanola (144 N. Y. 663, supra) and *335 Village of Port Jervis v. First Nat. Bank of Port Jervis (96 N. Y. 550, supra), Professor Prashker, in his work on New York Practice (4th [Prashker and Trapani] ed., pp. 346-347) said: “ 1 Vonching-in ’ or ‘ vouching to warranty ’ (the terms are used interchangeably) is a common law device available to a defendant who intends to sue for indemnification in the event of his being held liable in a pending action. It is a device for implementing the principle of res judicata in the indemnification action as to matters determined in the first action, and tends to preclude inconsistent determinations.”
In the later case of Hartford Accident (281 N. Y. 162, 169, supra), the Court of Appeals characterized the process as “ perplexing and inexact ”, and stated that “ Resort [thereto] has often provoked a new controversy as to the adequacy of notice and opportunity to defend [citing cases].” The “vexations inherent in the practice ” were also adverted to by the court in the still later case of Glens Falls Ins. Co. v. Wood (8 N Y 2d 409) where the doctrine of “ vouching in ” has been called the “ common-law counterpart and antecedent of statutory impleader ” and has been referred to in connection with the “conclusiveness of judgments ” (p. 412). On the other hand “ it has been said that its essential factors are hard to define but apparently the principles of res judicata are not involved (1 Freeman, Judgments [5th ed.], §§ 444-454) ” (Glens Falls Ins. Co. v. Wood, 9 A D 2d 201, 204, affd. 8 N Y 2d 409).
Weinstein-Korn-Miller, in their treatise on New York Civil Practice, state that, “ With this antipathy of the courts in mind, the careful practitioner will, whenever possible, use third-party practice rather than rely on vouching in ” (vol. 2, par. 1007.03). While it is stated by the Appellate Division in Glens Falls (p. 204) that the procedure is now “seldom invoked because of the third-party practice permitted by section 193 [193-a?] of the present Civil Practice Act [now CPLR 1007],” it was also there noted that it has “not [been] wholly abandoned ’ ’. It must be recognized, then, that it may be that statutory impleader does not supersede, but is additional and supplemental to, the process of vouching in (Cohen, ‘ ‘ Impleader: Enforcement of Defendants ’ Rights Against Third Parties ”, 33 Col. L. Rev. 1147, 1157, 1164-1165), and that “ It is still permissible, notwithstanding the fact that third-party practice is now governed by section 193-a of the Civil Practice Act, to vouch-in one who is not named as a party to the action ” (Cole v. Long Is. Light. Co., 14 A D 2d 922).
*336 VOUCHING-IN AS A SUIT WHICH THE INSURER OF THE VOUCHEE IS OBLIGATED TO DEFEND.
What if — notwithstanding the nebulosity, the uncertainty, the unsatisfactoriness, the limitations, the inadequacy, the indefiniteness of the device — the careful or careless practitioner, in a particular case, proceeded by way of vouching-in, rather than by way of the assumed, but perhaps not assured, substitute of the statutory provision for• third-party practice? The utilization of the allegedly dead, but very much alive (see, e.g., Uniform Commercial Code, § 2-607, subd. [5]; § 3-803) and, if so, deadly, technique would not — as I see it — make the lay (or even the legally educated) recipient of the notice any the more secure were he not duly to respond to it or properly to ignore it. Nor would that make him any the less proceeded against by way of the juridical process genetically defined in the insurance contract as a “ suit ”.
It is my opinion — whatever the terminology used in the books — that so much of the precept of the obligation of indemnification and so much of the extension of the1 applicability of the doctrine of res judicata or coriclusiveness of judgments or estoppel as results from the invocation by a litigant of, or attempted resort by him to, the procedure of “vouching in” are, indeed, a litigious process ‘which is in fact a “ suit ” within the meaning of the instant policy requiring • the insurer to ‘ ‘ defend any suit * * * against the insured ’ ’.
In coming to this conclusion, I do not rely upon a precedent in point — for I have been unable to find any. But there is a well-settled general principle which I do cite, and that is “ that if a policy of insurance is written in such language as to be doubtful or uncertain in its,meaning, all ambiguity must be resolved in favor of- the policy holder and against the company ” (citing cases) (Hartol Prods. Corp. v. Prudential Ins. Co. of America, 290 N. Y. 44, 49). “No insured reasonably reading this policy would see in'it an intention to make the distinction defendant attempts to make. In accordance with the settled rule that in case of doubt - policies of insurance are construed against the insurer, an accident [read “a- process ”] of the sort in question must be held to be within the coverage.” (Grand Union Co. v. General Acc., Fire & Life Assur. Corp., 254 App. Div. 274, 280, affd. 279 N. Y. 638.) Of course the power to bind an insurer must be found in the written con- ■ tract, of insurance (Alsam Holding Co. v. Consolidated Taxpayers’ Mut. Ins. Co., 167 Misc. 732,745); but where the instrument contains ambiguities, they must be resolved against the insurer as the party who drafted it (Kaye v. “ Doe ” [Lloyds *337 of London], 204 Misc. 719, 727). “ The meaning to be given to a contract of insurance must be the meaning that the ordinary businessman would give it ” (Faroll v. National Sur. Corp., 26 Misc 2d 548, 551-552). The 1 ‘ burden [is] on the defendant to establish that the words and expressions used not only are susceptible of [a] construction [favorable to the defendant] but that it is the only construction that can fairly be placed thereon” (Hartol Prods. Corp. v. Prudential Ins. Co. of America, 290 N. Y. 44, 49, supra, mot. for rearg. den. 290 N. Y. 744). With this principle in mind, I have no doubt that one who is ‘ ‘ vouched in ” in a pending suit is himself being ‘ ‘ sued ’ ’ within the meaning of the policy provisions here involved.
An interesting case — and a helpful one as indicating the trend and thinking of the Court of Appeals — is Madawick Contr. Co. v. Travelers Ins. Co. (307 N. Y. 111). There, an agreement had been entered into in which a subcontractor undertook to indemnify a general contractor against liability of the latter because of the subcontractor’s negligence, and wherein arbitration was provided for. The subcontractor was insured. The policy was similar to that in the case at bar, imposing upon the insurance company the defense of any “ suit ” against the subcontractor, but there was no express undertaking on its part to assume the defense of the insured in an “ arbitration proceeding”. The company refused to defend when informed of a demand for arbitration served by the general contractor upon the subcontractor in accordance with the provisions of the indemnification agreement. The subcontractor engaged counsel of its own choosing, and brought an action against the insurance company to recover the expense of such professional representation. The company argued that an “ arbitration proceeding ” was not a “ suit ” within the meaning of the policy, and that thus there was no obligation on its part, under the terms of its undertaking, to appear for and defend the subcontractor in that proceeding. The Appellate Division was persuaded, but the Court of Appeals disagreed. Nohvithstanding the omission of the words “arbitration proceeding”, but taking into account the language of the policy generally (such as the words “trial” and “judgment”) and the fact that the insurance company was aware[2] of the indem *338 nification agreement providing for arbitration, the court held that the demand for arbitration served upon the subcontractor was a suit ” which the insurance company was under a duty to defend.
•The direction of the Court of Appeals is further perceived in Doyle v. Allstate Ins. Co. (1 N Y 2d 439). There defendant issued to plaintiff a “ Comprehensive Personal Liability Policy ”, covering plaintiff, residents of his household, his dwelling- premises and animals kept on his property. Under the terms of the policy, defendant undertook “ To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, and as damages because of injury or destruction of property, including the loss of use thereof.” The policy also provided that the insurer would “ defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent” (emphasis supplied). Neighbors instituted a suit in equity to enjoin plaintiff from operating a kennel for dogs, alleging that the continual barking destroyed the peaceful and quiet enjoyment of their property, and that by reason of the nuisance maintained by plaintiff, the value of their property has been impaired and their health injured, that they had no remedy at law and that unless plaintiff were restrained they would suffer irreparable injury. Judgment was demanded not for money damages, but for an injunction, and “ such other and further relief as to the court may seem just and equitable, besides the costs and disbursements of the action.” Plaintiff notified defendant insurance company of the action against him, forwarded to defendant the papers served upon him, and requested defendant to defend the action in accordance with the terms of the policy. *339 Defendant refused. Plaintiff retained his own counsel, and instituted suit to recover the expense of such defense.
Special Term granted defendant’s motion for summary judgment dismissing the complaint upon the ground (1) that the insurer undertook to defend only actions wherein money damages were sought against the insured, and (2) that damages could not have been awarded in the injunction action. The Appellate Division unanimously affirmed (1 A D 2d 738). The Court of Appeals unanimously reversed, holding '(p. 443) that, since 11 a money judgment — damages — could have been awarded in the Markle [the neighbors’] action had the Markles established their right to equitable relief ”, and that since ‘ ‘ plaintiff would have been equally obligated to pay that money judgment * * * there can be no doubt that the insurer here undertook * * * to defend any suit in which the insured might be held legally obligated to pay damages by reason of his operating a kennel for dogs. The policy does not draw any distinction between damages awarded by a court of law and those awarded by a court of equity. The insured was justified in expecting that if suit was instituted against him wherein he might be legally obligated to pay a sum of money as damages because of his operating a dog kennel, the insurer would defend.” (Emphasis supplied.)
Vouching-In as a Procedural Device in the Court oe Claims.
I have indicated that it is my opinion that the service upon the plaintiffs by the State of the letter of February 20, 1961 and of the claims therewith enclosed was the commencement of a “ suit” against the plaintiffs within the meaning of the insurance policy. In arriving at this conclusion, I have — thus far — discussed the common-law device of “ vouching in ” and noted the statutory scheme of 11 impleader ”, as if the actions by Bronxville against the State were instituted and pending in the Supreme Court. Were that the case, it is clear that each or both of such processes could have been invoked by the State — for the Supreme Court is a tribunal of general jurisdiction as regards law suits brought against others than the State. But the primary litigations here involved being against the State, they are within the constitutional competence of the Court of Claims only. (Keaton v. State of New York, 206 N. Y. S. 2d 851.) In such circumstance, the question arises whether the procedures now being considered could have been invoked in the Court of Claims by the State in respect of and against the present plaintiffs, who were not parties to the litigations there prosecuted.
*340 In subdivision 9 of section 9 of the Court of Claims Act (in effect at the times with which we are here concerned) it is stated that, “ except as otherwise provided by this act or by rules of this court or the civil practice act, the practice shall be the same as in the supreme court”. The Court of Claims Act itself and the rules of that court promulgated thereunder are silent as regards either the procedures of impleader or of vouching in.[3] In 1951 the Legislature expanded the area to which the third-party practice of impleader is to be applicable. Section 193-a of the Civil Practice Act was amended by adding the following to the title: “ Courts to which applicable,” and the following to the text: “This section and any related rule of civil practice shall apply to all courts of record or not of record, other than courts of justices of the peace of towns or police justices of villages, and the judges or justices of such courts are empowered to adapt the procedure relating to the time for service of process or papers, form of summons or pleading’s and other details of practice or procedure, to their respective courts by rules if in their opinion any such adaptation is required or deemed desirable to render the application of the law effective therein.”[4]
It would therefore appear — at least at first blush — that both impleader and vouching-in are procedures within the ambit of permissible practice in the Court of Claims. Since there is nothing of nullifying import to be found either in the Court of Claims Act or in the rules promulgated thereunder, and since the Civil Practice Act then provided (and the CPLR now provide) for the impleading’ of a third-party defendant, it would seem, to all intent and purpose, that one could be impleaded as a third-party defendant in an action pending in the Court of Claims; for this is in consonance with the practice in the Supreme Court as well as with the language of the statutes. However, the intent does not appear to be the reality, nor does the purpose appear to lead to the fact — for, as has been pointed out in the Second Annual Report of the Judicial Conference (N. Y. Legis. Doc., 1957, No. 88, pp. 96-97, 100):
*341 ‘ ‘ The practice in the Court of Claims * * * is significantly different from that in the Supreme Court, even though the Court of Claims Act provides that practice in that Court is to be the same as in the Supreme Court except as otherwise provided by the Court of Claims Act, the rules of that Court or the Civil Practice Act. * * *
“ Ofttimes cases arise in which a claim has been filed against the State in the Court of Claims and the State has a claim over against another party, or where a private party is the defendant in an action in the Supreme Court or lower court and has a claim over against the State. In both instances it is impossible to implead the other defendant, and a separate action must be started in another court,” citing Horoch v. State of New York (286 App. Div. 303 [3d Dept., 1955]).
The Horoch case was an appeal from an order of the Court of Claims which denied a motion by the State to implead a third-party defendant. The controversy concerned an agreement entered into between the State and a demolition contractor to wreck certain buildings. The contractor employed the claimant, one Horoch, to assist in the work and, while he was thus engaged, an explosion occurred which injured him. Alleging that the State failed to provide adequate supervision over the wrecking operation and that it permitted a hazardous condition to exist on the job, Horoch filed a claim against the State and sued in the Court of Claims to recover damages for his injuries. Thereafter, the State, by motion, sought an order from that court authorizing it to implead Horoch’s employer so as to assert a claim for indemnification against the employer on two grounds: first, under the common law for negligence; and second, under the terms of a “hold harmless” clause contained in the contract between the State and the employer.
In affirming the denial of the motion, the Appellate Division stated (p. 304): “ If this were an action pending in a court of general jurisdiction, there could be no question of the State’s right to implead the corporate employer. (Civ. Prac. Act, § 193-a; Johnson v. Endicott Johnson Corp., 278 App. Div. 626; Robinson v. Binghamton Constr. Co., 277 App. Div. 468.) However, the Court of Claims has decided, and we agree, that the limited jurisdiction of the Court of Claims prevents impleading the corporate employer and, in effect, making it a ‘ third-party defendant ’ against whom the State may assert a claim.”
At pages 305 to 306, the court goes on to say: ‘ ‘ The Constitution of the State of New York delineates those over whom the Court of Claims may exercise jurisdiction. Section 23 of article VI reads, in part, ‘ The court shall have jurisdiction to hear and *342 to determine claims against the state or by the state against the claimant or between conflicting claimants as the legislature may provide.’ The Legislature, in enacting the Court of Claims Act, could not and did not enlarge upon the class of persons over whom the Court of Claims could assert jurisdiction. Section 9 of the Court of Claims Act authorizes claims against the State (subd. 2), counterclaims by the State against the claimant (subd. 3), and allows the Court ‘ To order the interpleader of other parties known or unknown whenever necessary for a complete determination of the claim or counterclaim.’ (Subd. 6.)
“ Subdivision 6 does not authorize the State to implead or bring in a third party against whom it may assert a claim over. The remedies of impleader and interpleader are different. Inter-pleader is the procedure by which one who may be exposed to multiple liability may require adverse claimants to litigate their claims in one action or proceeding. (Civ. Prac. Act, § 285). In the practice of impleader there are no adverse claims against the one under an alleged obligation. Impleader is the means by which the primary liability of the original defendant and the alleged ‘ liability over ’ of a third party may be settled in one action (Civ. Prac. Act, § 193-a).”[5]
Horoch also notes (p. 306) that an impleaded defendant would have a right to a jury trial, which is provided for in a court of general jurisdiction (N. Y. Const., art. I, § 2; see art. VI, § 18, subd. [a]), while there is no such right accorded him in the Court of Claims (N. Y. Const., art VI, § 18, subd. [b]; Court of Claims Act, § 12, subd. 3; see 2 N. Y. L. Forum 237; McNamara, “ The Court of Claims: Its Development and Present Role in the Unified Court System”, 40 St. John’s L. Rev. 1, 24). Then the court says (p. 306), that “ The right of the State of New York to implead a third-party defendant must await such time as it [the State] consents to be sued in a court of. general jurisdiction where the prospective third-party defendant would have available the rights guaranteed to him. In the meantime, the State may, by means of a separate action, enforce any right to indemnification from third parties in a court of general jurisdiction. ’ ’
In Patti v. State of New York (47 Misc 2d 622) an action was brought against the State to recover vibration damages to premises caused by railroad tracks which were laid on a portion of the claimant’s property. The State mailed notices to the railroad company, the general contractor and a subcontractor advising each recipient thereof of its contractual obligation to the State, *343 that the State would seek indemnification if any of the parties therein was negligent or caused the condition giving rise to the damages complained of, and, further, that it should appear and defend the claim at its own cost and expense. Thereafter, the railroad company moved to strike the notice. In denying the movant’s application, the court observed (p. 624) that: “ All that the notice can be construed to be is courtesy advice. The notice cannot be held to be prejudicial to any rights of the railroad. By serving the notice, the State has acquired no rights other than those to which it is entitled under the law. ’ ’
Whatever the appropriateness of the learned court’s denial of the railroad’s motion to vacate the notice served upon it by the State, I do not go along with all of the reasoning upon which that decision was based. The process of vouching-in is not, ordinarily, an idle or meaningless gesture. And, in the Court of Claims, it need not necessarily be so.
In the first place, the railroad company might not have been interested in having the factual issues of its liability over to the State resolved by jury determination or in awaiting another or later action in a court of general jurisdiction. If the railroad did undertake the defense in accordance with the opportunity afforded it by the State’s notice, and if the Court of Claims held the State liable to the claimant there — and were the railroad thereafter to undergo a change of mind and to endeavor to defend an independent suit for indemnification brought against it by the State — it is my view that the railroad would be precluded from contesting certain substantial and relevant issues which were resolved in the Court of Claims (see Hartford Acc. & Ind. Co. v. First Nat. Bank & Trust Co. of Hudson, 281 N. Y. 162,167-168, supra), and that expression of opinion on my part is separate and apart from the question as to whether the judgment of the Court of Claims would be conclusive upon the indemnitor in these respects were the latter not to assume the defense of the action against the State in that court. For while —■ as distinguished from the procedure of impleader — I do not, in respect to the process of vouching-in, find any constitutional inhibition similar to the one hereinbefore referred to, nor any statutory enactment in that regard, I do find a similar protection in the right to a jury trial if duly demanded and exercised (N. Y. Const., art. I, § 2; Civ. Prac. Act, § 425; CPLR 4101).
And the matter of an estoppel would still remain to be contended with. The precise language of the notice is not set forth in the opinion of the court in the Patti case (supra). If it were merely a so-called “ claim letter ”, I would not deem its transmission to be a “ suit ’ ’ within the meaning of the policy. But, *344 assuming that, by its terms, the notice operated in praesenti and was not an expression of what the State intended to do in futuro, and assuming further that it granted the railroad company control of the defense (Glens Falls Ins. Co. v. Wood, 8 N Y 2d 409, 412, supra), and if the company refused or failed to undertake such defense as thus proffered by the State, and if there were no just or reasonable cause for such active or inactive rejection, and assuming also that the judgment in the Court of Claims were in some way relevant or material to the issues in a subsequent suit by the State to recover from the railroad company as indemnitor, or its insurer, it might well be held that the latter should and would be estopped from asserting that the State had not duly and fully contested the action brought against it in the Court of Claims.[6]
Some question arose as to whether the State, under our law, can relinquish to a third party control of the litigation in which the State is a defendant, in that the Attorney-General alone may, by law, represent the State and thus cannot surrender to a private attorney the right to represent the State.
It may well be that such a naked delegation of official authority would not be legally allowable. Section 63 of the Executive Law provides that 11 The attorney-general shall: 1. Prosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all of the legal business # * * 0f any office thereof * * * in order to protect the interest of the state”. If the word “shall” is directory or permissive, rather than mandatory, then vouching-in would be permissible and effective in all of its aspects. But “ The auxiliary verb ‘ shall ’ * * * is primarily a word of command. As used in statutes that word is generally mandatory ’ ’. (Matter of Boulevard Theatre & Realty Co., 195 App. Div. 518, 519-520, affd. 231 N. Y. 615.) And “ the exercise by courts of a power to disregard a particular provision of a statute on the ground that it is directory merely, is a delicate one and should be applied with great 'caution. The intention of the legislature is the cardinal consideration * * * and whether a particular provision is mandatory or directory is to be determined from the language used and the purpose in view” (Wuesthoff v. Germania Life Ins. Co., 107 N. Y. 580, 589-590).
*345 I do not, however, conclude from this that it is unlaivful for the Attorney-General in an appropriate case to appoint a private attorney as his deputy or counsel to defend a claim against the State pending in the Court of Claims; and I may take judicial notice that, as a matter of practice in that court, that has been and is being done where the circumstances warrant and due protection is afforded the State. In any event, whether that could or should have been done was for the defendant to decide vis-avis its insured, and not for the latter to be required to engage attorneys at their own expense to advise in respect thereof.
It is of some moment to note, at this point, that, in the rescission action instituted by the defendant (hereinbefore referred to), it is alleged in the complaint, in respect of the claims instituted by Bronxville in the Court of Claims against the State that on February 20, 1961, the: “ State of New York served notice on the defendants [Clarke and Bapuano, the plaintiffs herein,] that as the designing and supervising engineers of Structure 7, the State of New York would expect them to indemnify and reimburse the State of New York for any liability arising by virtue of any error or omission in design, inspection or supervision, and 1 vouched ’ said defendants into the lawsuit pending in the Court of Claims and invited them to defend.”
And, in the plaintiffs ’ notice to admit served herein, the following was conceded by the defendant: “ That * * # the State of New York pursuant to a demand contained in a letter addressed to Clarke and Bapuano, dated February 20, 1961 * * *, sought to vouch in Clarke and Bapuano to defend claims asserted against the State of New York by Bronxville.”
Vouching-In in the Court of Claims as a Suit Within the Meaning of the Insurance Policy and the Scope of the Insurer’s Duty to Defend.
As I have hereinbefore indicated, I do not deem it necessary— for an appropriate disposition of the instant case — that I decide whether there was or was not in law a due and full vouching-in here. And I add here that it is, in my opinion, not incumbent upon me to decide whether there was or was not an estoppel to which the plaintiffs might be subjected. Suffice it to say that, so far as I have been able to ascertain, the court of last resort in this State has not, as yet, expressed its views on such issues. The logical consequence of my reasoning is that the problems involved were so beclouded and were so obviously unresolved by any authoritative determination that the onus was contractually placed upon the defendant insurer to determine what steps it was to take as a response to the process thus utilized by the *346 State —i.e., whether it would accept the opportunity to defend or whether it would affirmatively reject the proffer or whether it would be silent. The advisability and effect of any such action or nonaction on the part of the plaintiffs were matters which the defendant in the instant case was obligated to determine under its covenant to defend, and it could not with impunity impose that responsibility and result upon the plaintiffs.
Therefore, I conclude that the defendant in the case at bar was obligated, under its policy of insurance, to defend the plaintiffs in the “ suit ”• — the vouching-in process — instituted by the State against them, whether or not that procedure was valid, proper, effective or not. I am of the opinion that, within the frame of the contracted-for coverage, the insured was entitled to legal protection whether the suits against them were groundless or not — factually, legally, jurisdictionally.
As I have said, I have not found any authoritative precedent on all fours, but I think an adequate analogy is presented in the leading case of Goldberg v. Lumber Mut. Cas. Ins. Co. (297 N. Y. 148). There, defendant had agreed to defend suits against plaintiff for personal injuries caused by him. The policy coverage was limited to an accident “ ‘ caused by reason of the [insured’s] general business operations * * * which shall have occurred before the completion of the actual course of the operations performed by the insured at the place of occurrence of such accident. ’ ” (p. 151). Plaintiff was sued by a third person who alleged injuries caused by the former’s negligence. In turning the summons and complaint over to the defendant insurance company, plaintiff advised the carrier that it was not only unaware of the accident having been caused by his negligence, but that he had completed the job at least a week prior to the date specified in the complaint. Possessed of this information, the company disclaimed and refused to defend unless the insured signed an agreement that such defense by the insurer would not constitute a waiver by either party of any provision of the policy, nor foreclose the insurer from asserting any defense which it might choose to make under the policy — a condition which the plaintiff rejected, thereafter retaining his own counsel who successfully defended the action at his own expense. The insured then sued the carrier to recover that cost. Speaking through Associate (now Chief) Judge Fttld, the Court of Appeals pointed out (pp. 152-153) that, “ascribing to the terms of the policy, as we must, a natural and reasonable meaning * * * the company’s obligation was to ‘ defend in the name of and on behalf of the insured any suit against the insured alleging such injury and seeking damages on account thereof, *347 even if the suit is groundless, false or fraudulent ’ ” (emphasis in original), stating further that (p. 153): “In the clearest of terms, the insurer obligated itself to handle the defense of actions against the insured whenever the complaint served upon him alleged a state of facts covered by the policy, regardless of whether such allegations squared with objective truth or were utterly false and groundless.”
It was also there said (p. 154): “ In short, the policy protects the insured not only against injuries for which there is unquestioned liability, but also against lawsuits on their face within the compass of the risk against which insurance was taken, no matter how groundless, false or baseless those suits may be. It follows, therefore, that defendant’s refusal to defend the negligence suit was a breach of its covenant for which plaintiff may recover the expenses incurred by him in defending that action.” (Citing cases.) (See Grand Union Co. v. General Acc. Fire & Life Assur. Corp., 163 Misc. 451, affd. 251 App. Div. 810; also 254 App. Div. 274, affd. 279 N. Y. 638.)
Similarly, as I view the legal picture here, it was not for the present defendant to say to the plaintiffs that it would defend them only against litigation validly instituted and only in courts having jurisdiction of the subject matter of the proceeding and jurisdiction of the person of the insured therein — any more than it was legally permissible for the insurance company to say to Goldberg that it would defend him only when the pleading of his adversary in the primary suit against him is, on the basis of its investigation and analysis, in consonance with its view of the facts or in keeping with its opinion of the accepted law.
It is true, as it turned out, that the issue of the plaintiffs’ liability to the State remained to be definitively determined, if ever, in any subsequent suit brought by the State in a court of general jurisdiction. It is precisely because such an eventual separate action might have been brought against them for indemnification that the plaintiffs’ reaction to the State’s vouching-in procedure had to be promptly and properly assumed. In the light, particularly, of the difficulties and ramifications indigenous to this process — as I have hereinbefore outlined them — it is not the insured who should be saddled with the financial responsibility of their consideration and disposition. The defendant should not be permitted to place upon the holder of its insurance policy the task of ascertaining in each specific instance at his peril and at his expense whether he should or must defend on his own. That burden was assumed by and falls upon the insurance company under its undertaking to ‘ ‘ defend any suit ” against the insured.
*348 In sum, I construe the word “ defend ”, as used in the policy, to include such matters of research and analysis, consultation and advice as to the issues of procedure and merits, strategy and tactics, related to the plaintiffs’ status in litigations in the Court of Claims resulting from the service upon them by the State of the vouching-in papers. And I hold, on this phase of the case, that the reasonable expense actually incurred by the plaintiffs in retaining competent counsel to study and solve the problems and issues occasioned by the State’s utilization of such process against them is recoverable from the defendant, who, in breach of its contract to defend, repudiated the policy, disclaimed its obligation, failed to advise and protect its policyholders in respect of such process, and, in fact and in effect, refused them a defense therein. That, after a thorough and complete review of the facts and the law undertaken by the plaintiffs’ personal attorneys (all necessary in order that they might determine whether to accept or ignore the State’s vouching-in procedure) the result was a decision not to engage actively in the litigation in the Court of Claims, did not relieve the defendant of its obligation to the plaintiffs under the policy of insurance.
Extent and Character of Legal Services Properly Chargeable to the Insurer upon Breach of Obligation to Defend.
The defendant conceded, upon the trial, that it was liable to the plaintiffs in some amount — but only for those services rendered by their attorneys in connection with the impleader proceedings in the Supreme Court, Westchester County, hereinafter to be discussed. The defendant denied liability to the plaintiffs for any amount in respect of services rendered in the vouching-in proceedings in the Court of Claims. The sum to be awarded is, of course, the ultimate question. In the meanwhile, I come to the applicability of the general principles I have set forth to the factual question of what were the legal services rendered by the plaintiffs’ counsel in regard to the vouching-in that are properly chargeable to the defendant.
Plaintiffs ’ Exhibit 1, entitled ‘1 Time Expended by Lord Day & Lord for which Reimbursement is Sought ’ ’ shows that such services commenced on March 23, 1961, some three months and seven days prior to the written disclaimer by the defendant. It is the defendant’s position that no recovery may be had for legal expenses incurred prior to June 30, 1961, the date of the defendant’s formal disclaimer. The defendant points out that the plaintiffs retained counsel on March 23, 1961, and that on *349 March 28,1961 these attorneys wrote to the defendant suggesting a conference to discuss “ the nature of the reply which should be made to the Attorney General ’ ’, concerning the letter of vouching-in dated February 20, 1961. The register slips which comprise Lord, Day & Lord’s daily work records show that, on that issue, the plaintiffs’ attorneys were in communication with the defendant until April 11, 1961.
The defendant urges that this period was spent by it in a study of the case so as to determine whether it would or would not disclaim. No doubt, where the insurer is relying upon an exception in or claimed lack of coverage under the terms of the contract it ‘ ‘ is entitled to a reasonable period of time for investigation before it is required to accept the defense or stand on its contract and deny liability ” (3 Richards, Law of Insurance [5th ed.], p. 1391). Whether the same leeway should be allowed to an insurer who repudiates the policy entirely on the alleged (and later judicially determined groundless) claim of fraud in the inception of the contract, is another matter. In any event, I find that the period from February 20, 1961 to March 23, 1961 was time enough for the defendant to become oriented on the question as to whether there was or was not to be a disclaimer.
I do not deem it to have been within the contemplation of the parties when the contract of insurance was entered into or during the later consultations that the defendant could determine on its own when it would commence performance of its obligation to defend — and that, in the meanwhile, the plaintiffs’ attorneys would render the services required to be performed without the plaintiffs being reimbursed for the fair cost of the legal fees charged for this period of time. Because of the complex nature of the issues resulting from the claims asserted against the plaintiffs in the Court of Claims which required research of the law, review of previous proceedings therein, contract documents, voluminous plans and specifications, as well as extended conferences with engineers, attorneys, and other persons, I conclude that it is not proper to accord to the defendant — at cost of the plaintiffs — such a substantial period of time as is requested by the defendant — to wit, to June 30, 1961 — in which to assess its obligations under the policy. These services were a necessary part of the defense required to be forthcoming from the defendant under the contract of insurance, and payment therefor by the plaintiffs is recoverable upon the defendant’s breach even though such services were rendered prior to formal disclaimer.
*350 The next question to be answered here is — Until what date is the defendant to be charged for the services rendered by the plaintiffs’ attorneys in defense of the State’s vouching-in procedures in the Court of Claims'? The outside period would, of course, in an ordinary case, be when the suit there was terminated. And there should be no difference in the case of a “ suit ’ ’ by way of attempted ‘ ‘ vouching-in ’ ’. I hold that when that process has spent its force the point of cleavage has arrived. In this case that date is November 27, 1962. The Court of Claims proceedings by Bronxville against the State were then adjourned sine die, pending the disposition of the Westchester Supreme Court action of Bronxville against Poirier, and by that time the plaintiffs had been impleaded by Poirier in that action and had affirmatively determined on advice of counsel that they would not participate in the actions pending in the Court of Claims.
In Smith-Cairns Co. v. State of New York (45 Misc 2d 770), the claimants sued in the Court of Claims, alleging that damage was caused by the negligence of the State and/or contractors performing construction work on the same Sprain Brook Parkway as that involved in the instant case. Thereafter, and in similar fashion as here, the claimants commenced an action in the Supreme Court, Westchester County, against Poirier & McLane Corporation, the general contractor, alleging its negligence in the construction work. In disposing of a calendar application made before the Court of Claims, the following procedure was enunciated by the court (pp. 773-774): “ Th[e] state of the present law compels one with a claim against the State and against another party, as joint tort-feasors, to pursue his remedy against the State in this court and against the other in the Supreme or another court. At the time the claim is reached for trial in the Court of Claims, while the other action is still pending, a problem is presented to this court in that it must determine which actions should be tried first.
“ It seems to be the consensus of opinion of the Judges of this court in such a situation that the action brought against the contractor in a court other than the Court of Claims should be tried first, on the theory that generally speaking, the contractor is the direct wrongdoer. At the conclusion of that trial, the claimant may determine if it is advisable or necessary to proceed with the trial of the claim against the State in the Court of Claims, for in many eases the trial in the other courts would be dispositive of the claimaint’s rights.”
So, in the case at bar. The Westchester Supreme Court action of Bronxville against Poirier and Raymond was tried and *351 judgment was rendered on the merits on August 2,1965 in favor of the defendants.[7] That finally laid at rest any possible claim over against the present plaintiffs by Poirier or Raymond, as to those issues there litigated (Bronxville Palmer v. State of New York, 25 A D 2d 709, affd. 18 N Y 2d 560). At any rate, so far as the present record discloses, the Court of Claims proceedings as against the plaintiffs were not revived.
As to the second phase of the case (the Bronxville action in the Supreme Court, Westchester County, and the impleader of the plaintiffs as third-party defendants therein), it will be recalled that, in March, 1960, the action was instituted by Bronx-ville against Poirier and Raymond, that Poirier, on July 31, 1961, impleaded the plaintiffs, and that, on August 3, 1961, the plaintiffs requested the defendant to undertake the defense thereof in accordance with its obligation under the insurance policy. The defendant continued to maintain its position of disclaimer — with reiterated consistency — and refused to defend the plaintiffs in that suit also.
It may be said — without the need of analysis or citation- — ■ that this suit clearly comes within the purview of the defendant’s obligation to defend under section 11(a) of the insurance contract between the parties. Indeed, that much the defendant expressly concedes. Therefore the plaintiffs are entitled to recover all expenses incurred by them in connection therewith. However, factual questions, similar to the ones covered in the vouching-in phase of the case, must be considered here as well. *352 They are (a) from what date and (h) to what date is such expense properly chargeable to the defendant.[8]
As to the date of commencement of the defendant’s liability in respect of this action, I hold that, even though the defendant had formally repudiated the contract on June 30, 1961, it is not that date but rather the date when suit was instituted against the plaintiffs by way of impleader (July 31, 1961) that marks the point of departure in respect of the Westchester action. On the other hand, the fact that the defendant did not expressly repeat its disclaimer until its registered letter to Lord, Day & Lord dated August 7, 1961, does not vitiate its plain anticipatory breach. In the circumstances of this case (the pendency of the proceedings-in-chief in the Court of Claims, the interposition of the vouching-in process there, the pendency of the main action in the Supreme Court, Westchester County, and the defendant’s stated position throughout) the plaintiffs were justified in the continuation of the retention of counsel to protect their interests the moment process was served upon them. The plaintiffs had no reasonable cause to expect that the defendant, so definitively having disclaimed, would change its mind upon subsequent receipt by it from the plaintiffs of the third-party summons and third-party complaint. The legal services then rendered by the plaintiffs’ attorneys were beneficial to the defense of the third-party suit, and the dismissal of the third-party complaint herein-above discussed accrued to the benefit of the defendant.[9]
Now, as to the tail cut-off date. Through their attorneys, the plaintiffs herein duly moved to dismiss the third-party complaint. The motion was granted and the complaint was dismissed, pursuant to a decision filed in Special Term, Part I, of the Supreme Court, Westchester County. A copy of that decision was published in the New York Law Journal of December 18, 1961. The court granted leave to the third-party plaintiff (Poirier) to serve an amended complaint upon the third-party defendants (the plaintiffs herein) within 20 days of the service of the order therein, with notice of entry. It does not appear *353 that an amended pleading was in fact served by the third-party plaintiff at any time. An examination of the plaintiffs’ attorneys’ daily register brings forth the following pertinent entries, all of which postdate the decision dismissing the third-party complaint: ‘ ‘ 12/19/61 &emdash; Reviewed decision * * * ; 1/11/62 &emdash; Conf. LSL [one of plaintiffs’ attorneys’ firm] re proposed Order in Westchester County proceeding * * *; 1/17/62 * * * wrote to Clark re withdrawal of Poirier & McLane Thereafter, except for the notation made on November 27, 1962, to the effect that the Court of Claims cases were being adjourned ‘ ‘ pending outcome of Poirier & McLane case in Supreme Court, ’ ’ there is no other reference to the determination dismissing the third-party complaint, to the order thereon or to the plaintiffs’ actual participation as third-party defendants in that action. I conclude, therefore, that the plaintiffs’ active involvement in that litigation&emdash;at least insofar as the responsibility of the defendant to the plaintiffs for the expense of counsel is con- cerned&emdash; terminated on January 17, 1962, or a month after the rendition of the decision of dismissal (thus giving time for the service of an order thereon and the service of an amended com- plaint accordingly). Liability of
Insurer for Legal Services in Respect of Possible Future Actions Against the Insured. The plaintiffs
The plaintiffsurge that they are entitled to recovery for services rendered by their attorneys beyond that date, in that, at least from March 14, 1962, to January 13, 1963, the attorneys were, as the plaintiffs assert, in their Exhibit No. 1, “ Reviewing records and facts for use in Court of Claims litigation and pos- sible actions instituted by Poirier & McLane.” Insofar as those services were rendered from March 14, 1962 to April 11, 1962, on May 24 and 25, 1962, and on November 27, 1962, I find that they were referable to the Court of Claims matter, and are therefore to be paid for by the defendant. I find,
I findon the facts, that the plaintiffs’ attorneys, with minor exceptions,[10] actually performed' services as regards the pro- ceedings actively pending in the Court of Claims, between the dates of April 12, 1961 and April 11,1962; and, that, as regards the impleader action, between the dates of July 31, 1961 and January 17, 1962. However, those items beginning May 3, 1962 and ending May 22, 1962, from May 25, 1962 through November 23,1962, and from November 28,1962 through January 16,1963, 10 The *354 are clearly related solely to the plaintiffs’' controversy with the defendant insurance company and are so designated by the plaintiffs’ attorneys themselves in the title portion of their daily register (defendant’s Exhibit F).
Moreover, as to the ‘ possible actions instituted by Poirier & McLane ”, insofar as these services are intended to apply to the case in the Supreme Court, Westchester County (in which the plaintiffs had been impleaded as third-party defendants and which litigation has already been discussed as to its effect upon the plaintiffs’ cause of action herein) they were completed by the consecutive occurrence of the dismissal by the court of the third-party complaint on December 18, 1961, and the nonservice by Poirier of an amended third-party complaint following this date. And I have expressed my ruling that the legal expense for the services therein is recoverable.
But the defendant’s alleged liability for services relating to future “possible actions” is another matter. I hold that a “ suit ” — that is to say, litigation of some sort (one in fact and not in expectation) —there must be, to come within the coverage of the insurance company’s obligation to defend. Potential litigation does not suffice to call into play the policy provision upon which the plaintiffs are required to base their claim for reimbursement. Moreover, the plaintiffs were under a duty to minimize their damages, rather than to augment them by way of expanding the area of legal protection which they deemed it advisable to obtain in this instance (see Olsen v. United States Fid. & Guar. Co., 230 N. Y. 31, 36).
“ It is a well-established rule of damages that one who is injured by the wrongful act or omission of another is required to exercise reasonable efforts to avoid, minimize, or lessen the resulting injury, and will be denied recovery for any loss or injury chargeable to his failure to do so. A defendant cannot be charged for losses resulting from the wrongful act which a reasonable degree of prudence on the part of the plaintiff would have averted.
“ The duty to take reasonable measures to avoid loss or to diminish the damages that may occur from another’s wrongful act is applicable to all who may claim indemnity from others for losses, embracing both actions for breach of contract and actions arising out of negligence or other tortious acts.” (13 N. Y. Jur., Damages, § 23, pp. 451-452.)
The plaintiffs could have, with reasonable prudence, and with a fair contemplation of all of the circumstances, terminated the further rendition of legal services to them at this stage — to *355 await their resumption in the event of subsequent actual actions against them.
At the present juncture of the consideration of the pertinent issues, three additional arguments made by the defendant require attention.
Legal Services Rendered by the Insured’s Attorney Upon Breach op Insurer’s Covenant to Defend as Equated with the Assistance and Co-operation of the Insured Required Under the Policy.
The defendant contends that the professional services of Lord, Day & Lord from March 23, 1961 (the date of their retainer by the plaintiffs) to June 26,1961 (the date of the defendant’s first formal disclaimer) were those necessarily rendered by them in the performance of the plaintiffs’ obligation under Condition No. 5 of the insurance policy calling for the usual “ Assistance and Cooperation of the Insured.” And, the defendant says, that during that period it was studying the situation to determine whether it would perform the promise made by it when it was paid for and issued the policy. But, as I have hereinbefore stated, the several weeks to March 23, 1961, gave the defendant time enough to make this survey and resolution for its own benefit — keeping the plaintiffs in suspense in the meanwhile. As a consequence, the defendant was not entitled, thereafter, to call upon the plaintiffs, at their expense, to co-operate with and to assist it.
Co-operation is not a one-way street. Both as a matter of logic and of contract, the term envisages that the parties involved work together for mutual benefit or a common goal. It excludes repudiation, rejection, disavowal or disclaimer^ either expressly or by obvious implication. Within the contemplation of the obligation of the insured to co-operate is the corresponding duty of the insurer to defend. I hold that an insurer cannot wrongfully refrain from defending a suit against the insured and at the same time insist upon his assistance under the terms of the policy. The defendant must first, in good faith, have recognized and honored its duty to render the plaintiffs a legal defense before it should be permitted to escape from its liability to meet the cost of the plaintiffs’ necessary self-defense by calling it required co-operation.
Indeed, the pertinent rule of law in this connection has gone even further: “An * * * unwarranted refusal to defend * * * relieve[s] the [insured] from his contract obligation to leave the management of such suits to the insurer, and *356 * * * justifies] him in defending the action on his own account.” (7A Appleman, Insurance Law and Practice, § 4691, p. 498.) And, not only does the insured then have the right of absolute control of the defense (29A Am. Jur., Insurance, § 1461, p. 573); he may go so far as to make a settlement or compromise of the claim against him for a sum, which (if reasonable in the circumstances) the insurer will be obligated to pay (Cardinal v. State of New York, 304 N. Y. 400, 410, supra).
Liability of Insurer for Legal Services Rendered to Insured When Such Services Have Double Utility.
The next contention made by the defendant is that, assuming that the plaintiffs are entitled to recover the fair and reasonable value of certain legal services rendered by their attorneys and paid for by the plaintiffs, such services must be directly related to the defendant’s disclaimer and within the purview of its obligation to pay and defend under the policy. And at this point, the defendant urges, firstly, that since the policy had a liability payment limit of $500,000 (with a $5,000 deductible clause) and since the damages sued for by Bronxville were for $12,400,000 in the Westchester County Supreme Court action and for $24,000,000 in the Court of Claims proceedings, it is reasonable to assume that the plaintiffs would have retained and paid their own attorneys in any event in connection with such excess exposure — and, therefore, that the plaintiffs’ damages because of the breach were minimal or at least should be computed percentage-wise.
I do not agree with this conclusion. The covenant to defend is absolute and independent of any financial limitation on the carrier’s liability. The insured could have retained advisory co-counsel at their own expense if they chose to do so, but this does not relieve the insurer of its obligation in this regard, which is ‘ ‘ indivisible ’ ’ and which ‘ ‘ requires the carrier to conduct the whole defense * * * to vindicate the rights of the insured ”. (Kaste v. Hartford Acc. d Ind. Co., 5 A D 2d 203, 206; cf. Fidelity Gen. Ins. Co. v. Aetna Ins. Co., 27 A D 2d 932.) And, with the consent of the insured, control of the defense of the litigation is pre-empted by and to the insurer under the terms of the policy, irrespective of any comparison or contrast between the sum sought to be recovered from the insured and the amount of the policy insurance. (Auerbach v. Maryland Cas. Co., 236 N. Y. 247, 252.)
Although I have referred at some length earlier to the leading case of Goldberg v. Lumber Mut. Cas. Ins. Co., (297 N. Y. 148, supra) it cannot escape further reference at this point, for *357 what was there said at page 154 is apposite here: “ The courts have frequently remarked that the duty to defend is broader than the duty to pay. Indeed, even in cases where the policies do not render the allegations by the injured party controlling, it has been said: ‘ The distinction between liability and coverage must be kept in mind. So far as concerns the obligation of the insured to defend the question is not whether the injured party can maintain a cause of action against the insured, but whether he can state facts which bring the injury within the coverage. If he states such facts the policy requires the insurer to defend irrespective of the insured’s ultimate liability ’ (citing cases).”
Proceeding now to the final submission of the defendant at this posture of its argument, it points out that counsel fees are not recoverable by the plaintiffs for the defense of the rescission action (even though there was judgment on the merits dismissing the insurance company’s complaint), that the issues in the action for rescission were substantially the same as those raised by the plaintiffs in defense of the claims against them made by the State in the vouching in and by Poirier in the impleader, and as a consequence, the services rendered by the plaintiffs’ personal attorneys were not the sole and direct result of the defendant’s disclaimer of liability and breach of its obligation, and therefore the expense incurred therefor was not recoverable in this action. In this regard, it is the defendant’s position that, since, as a matter of asserted chronology, the rescission action was required to be defended by the plaintiffs first, and since their attorneys had no choice, in support of their defense, but to educate themselves on the complex facts and on the complicated matters of law with reference to the issues there involved, and since the legal services performed in preparation for the future defense of the State and the Poirier claims were identical with the work done in the defense of the rescission action, and since the plaintiffs are not entitled to recover counsel fees for the latter, they should not be permitted to attribute the rendition of such services to the former litigations, and thus be enabled to recover indirectly what they were not entitled to in the first instance.
On the other hand — while not contending[11] that they may receive reimbursement for the expense involved in their defense *358 of the rescission action per se — the plaintiffs argue that, by reason of the disclaimer, they were caused to meet the cost of professional representation in connection with (1) the vouching in of the plaintiffs by the State in the Court of Claims; (2) the impleader by Poirier of the plaintiffs as third-party defendants in the litigation instituted by Bronxville in the Supreme Court of Westchester County; and (3) the services rendered by their attorneys with respect to the preparation of a complete defense posture against such claims, presented and likely to be presented by the State and Poirier and perhaps Raymond, some portions of which services — it is conceded— were also used in successful defense of the rescission action. The plaintiffs assert, for example, that the time expended by their attorneys in conferring with technical witnesses who were to testify at the trial of the rescission action was also necessarily related to the preparation of a defense against the demands asserted against the plaintiffs by the State and by Poirier. Similarly, they say, the time spent in reviewing voluminous plans and technical data, although applicable to the rescission action, was also necessarily expended and directly related to the development of a defense posture with respect to the allegations made by the State and Poirier. Thus, the thrust of the plaintiffs’ argument here is that, while the issues involved in the rescission action were the same as those raised in the asserted claims, and that the time expended in professionally preparing a defense to the insurance company’s action to rescind the policy and in effect to obtain a judicial declara *359 ti on of the validity of its disclaimer, would have been necessary even if the plaintiffs did not require preparation for the defense of the proceedings against them and for the development of a defense posture as hereinbefore indicated with respect to the suits against them by the State and by Poirier, the circumstance that the education which they received in the course of preparing and defending against the rescission action might prove useful in connection with the other litigations should not bar recovery therefor.
I do not go along with the contentions of either of the parties in this respect — ■ certainly not in full procession. On the one hand, the plaintiffs make no distinction between an actual suit and a prospective one. And, on the other hand, the defendant seeks to relegate as much of the services rendered by the attorneys as possible to the defense of the rescission action as such. These matters are resolved on the evidence as presented to me, both oral and documentary.
In arriving at my conclusion as regards the Court of Claims proceedings, I allow full recovery for the legal services necessitated by the vouching-in process and actually performed in connection therewith, insofar as those proceedings were actively pending against the plaintiffs; and similarly, for those services performed in connection with the third-party action during the period that it was actively pending against the plaintiffs in the Supreme Court, Westchester County. However, compensation for such services as were referable solely to the establishment of a so-called “ posture ” available for the protection of the plaintiffs in respect of a future suit against the plaintiffs is disallowed in the present suit by them. Also, of course, any services of Lord, Day & Lord solely referable to the defense of the rescission action are not compensable in this suit.
As to another factual situation, I find that — unlike the problem presented to me in the case of Israel Commodity Co. v. Banco Do Brasil, S. A. (50 Misc 2d 362) —there is, in the case at bar, a certain blurring or blending of legal services. In the circumstance where such grey area exists, I rely upon the principle that the damages entitled to be recovered from one who violates his contract “ are nearly always involved in some uncertainty and contingency; usually * * * they can be determined only approximately upon reasonable conjectures and probable estimates ” (Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 209 ; see Randall-Smith, Inc. v. 43rd St. Estates Corp., 17 N Y 2d 99); and, accordingly, I overrule the defendant’s objection to the contrary, and I award the plaintiffs appropriate recovery for such services.
*360 reasonable compensation eor legal services rendered to INSURED AND INTEREST THEREON.
In fixing the amount which the plaintiffs are entitled to receive, I note that the fees which they were charged (and paid) were computed by the attorneys on a time basis — $60 per hour for a partner or a senior attorney, and $35 per hour for an associate attorney. In determining whether the bills so rendered express the reasonable value of these professional services, I consider, among other factors, ‘ ‘ the character and extent of the services and the nature of the litigation or transaction in which they were rendered, the intricacy or difficulty of the case and of the questions and problems confronting the attorney * * * the amount of money involved * * * the effect of the litigation involved upon other matters ”, as. well as the time necessarily expended. (3 N. Y. Jur., Attorney and Client, § 102, pp. 509-511.) I conclude that the hourly rate charged in this case is fair and reasonable (cf. Rosenstiel v. Rosenstiel, 28 A D 2d 651, 652-653).
I find that the value of the services for which the defendant is liable to the plaintiffs is the sum of $4,750 in the Court of Claims suit and $4,250 in the Supreme Court, Westchester County suit, making a total fee of $9,000, and that the disbursements recoverable here were $163.56,[12] making a full amount of $9,163.56. Interest is to be paid thereon from January 16, 1962 (Prager v. New Jersey Fid. & Plate Glass Ins. Co. of Newark, 245 N. Y. 1, 5-7; CPLR 5001).

 As will be later seen, the defendant’s aetion in respect of the policy of insurance was one of “repudiation” and “rescission” of the contract as a whole, upon the alleged ground of the fraud of the plaintiffs, rather than one of “ disclaimer ” or alleged “ lack of coverage ” in reliance upon the terms of the contract. But I have, in this opinion, now and then, used the expressions of the parties as contained in their documents and as given in their testimony.

 Similarly, the insurance company here was cognizant of the plaintiffs’ dealings with the State of New York. The policy was written with such contractual arrangements in mind. In its printed form of “ Exclusions ”, the policy provided that it “ does not apply * * * (e) to liability arising out of operations in connection with bridges and tunnels which exceed one *338 hundred fifty feet in over-all length * * * (g) to liability assumed by the insured under any contract or agreement”.'
By -way of special indorsement, it was “agreed that notwithstanding anything to the contrary set forth in exclusion (e) of the policy the insurance afforded by the policy applies to liability arising out of operations in connection. with tunnels or bridges, and (c) is amended accordingly.”
It was further specially “ agreed that notwithstanding anything to the contrary set forth in exclusion (g) of the policy, the insurance afforded by the policy applies to liability assumed by the insured in any contract described in the schedule below executed by the insured with the party named in said schedule.” The schedule referred to, insofar as relevant, reads as follows: “ Conservation Dept. Taeonie State Pkwy * * * New York State Thruway [,] N. Y. State Dept, of Public Works.”

 Interpleader (Civ. Prac. Act, §§ 285, 286, now CPLR 1006) is expressly sanctioned (Court of Claims Act, § 9, subd. 6).

 This amendment was occasioned by the conflict then existing as to the applicability of section 193-a of the Civil Practice Act to several of the city and municipal courts, but it was recommended as well so as “to bring to all the courts of the State, other than courts of Justices of the Peace of Towns and Police Justices of Villages, the procedural benefits of impleader practice” (Seventeenth Annual Report of 1ST. T. Judicial Council, 1951, p. 66).
Its substance is now contained in CPLR 101.

 Under Federal practice, the United iStates may implead and interplead (Rules of the United States Court of Claims, rules 23 and 25 [U. S. Code, tit. 28]; see Cardinal v. State of New York, 304 N. Y. 400).

 I note, in passing, that the two contracts entered into between the State and the plaintiffs in the ease at bar provide, in one instance, that the latter must procure and maintain at their own expense “ Protective and Liability insurance issued to and covering the liability of the People of the State of New York ”, and, in the other, “ protective liability insurance for the benefit of the People of the State of New York”, in respect of these operations by the plaintiffs.

 note this date here (Ang. 2, 1965) to make the record complete. But that is not the date to which the plaintiffs say they are entitled to charge the defendant with the cost of their attorneys’ services. The plaintiffs do contend that, since the validity of the disclaimer by the defendant of its liability under the policy was not finally resolved until March 11, 1965, when the Court of Appeals denied the defendant’s application for leave to appeal to that ‘Court from the Appellate Division’s affirmance of the judgment against it in the rescission action, that should be the over-all terminal date in respect of all the phases of the controversy — both as to the Court of Claims vouching-in proceedings and Supreme ‘Court, Westchester County, third-party action, and that services rendered by Lord, Day & Lord to that date should be paid for by the defendant.
I do not agree that the defendant’s responsibility was extended by virtue of the chronological fact thus relied upon. The liability ceased when, in substance, the obligation to defend ended, and that came about when there was no litigation actually pending against the plaintiffs at the behest of other parties, not the defendant. What the situation and the result will be in the event that a suit is subsequently instituted against the plaintiffs is not, in the present case, for me to say.

 The ultimate question here is, of course, the proper amount to be awarded the plaintiffs in this ease, and that will he later considered in connection with the fixation of the sum due for services rendered in the vouehing-in area of the controversy.

 The plaintiffs’ payment for the services rendered hy Lord, Day & Lord during this period is, I have held, recoverable from the defendant because the vouching-in proceeding was still pending, and such services were also related thereto. As a matter of dollars and cents result, therefore, this feature of my determination makes no practical difference. I delineate it here only because I assume it is my judicial responsibility to make clear the factual and legal bases for my several rulings on the separate aspects of the controversy (cf. CPLR 4213).

 Theexceptions pertain to services rendered on September 20, 22 and 27, 1961, in preparation for an examination before trial of the defendant in the rescission action. rescission action.

 In the absence of a protective contractual clause or of a statutory provision or other special circumstances, such as malice, allowing the recovery of counsel fees and other expenses incurred in defending a lawsuit, this reticence is in consonance with the overwhelming state of the established and existing law in this country, including New York, even though the suit brought against the *358 defendant— as in the ease here in respect of the rescission action — is found to have been meritless. (Marvin v. Prentice, 94 N. Y. 295, 302; Manko v. City of Buffalo, 271 App. Div. 286, 296; 22 Am. Jur., 2d, Damages, § 165, p. 234; 25 C. J. S., Damages, § 50, pp. 777-779; 9 Encyclopedia New York Law, Damages, § 167, p. 158; 13 N. Y. Jur., Damages, § 143, p. 646; see, also, Fleischman Corp. v. Maier Brewing, 386 U. S. 714; Doyle v. Allstate Ins. Co., 1 N Y 2d 439, 444; Avalon Constr. Corp. v. Kirch Holding Co., 256 N. Y. 137, 145; Agostini v. State of New York, 255 App. Div. 264, 267; Soffer v. Glickman, 27 Misc 2d 721, 724-725; see CPLR Arts. 81, 82).
There was neither allegation in the pleadings, suggestion in the proof, nor contention in the brief of the plaintiffs that the institution or prosecution by the defendant of its action to rescind the insurance policy was an ulterior tactic on the part of the insurance carrier to confuse or integrate the issues required to be defended by it — on the one hand — with those which the plaintiffs were to defend in the rescission suit against them — on the other — so that the company was thereby enabled, notwithstanding its breach of contract, to reap for itself the benefit of the professional services rendered by the plaintiffs’ personal counsel in their defense of the rescission action as an adversary proceeding between the insurance carrier and the policyholder. (See Sukup v. State of New York, 19 N Y 2d 519.)

 According to the bills rendered by the plaintiffs’ attorneys, the sum of $1,593.91 in disbursements was expended in the defense of the rescission suit. Of course, these are not approved for recovery in this action. Nor is the sum of $138.21 set forth in the statements, since the items making up this subtotal were not shown to have been expended in connection with the pending proceedings involving the vouching in or the impleader.