[836 NYS2d 99]

SEWARD PARK HOUSING CORPORATION, Respondent, v GREATER NEW YORK MUTUAL INSURANCE COMPANY, Appellant.

First Department, May 10, 2007

## APPEARANCES OF COUNSEL

*Thomas D. Hughes,* New York City, and *Speyer & Perlberg, LLP,* Melville (*Dennis M. Perlberg* of counsel), for appellant.

*Anderson & Ochs LLP,* New York City (*Steven S. Anderson, Mitchel H. Ochs* and *Jason A. Stern* of counsel), for respondent.

## OPINION OF THE COURT

CATTERSON, J.

In this insurance breach of contract action, we are asked to determine, inter alia, whether the insurance company's denial of coverage constituted a repudiation of liability or a disclaimer of coverage, and thus, whether the plaintiff was obligated to comply with contract provisions in order to recover the replacement cost of a two-level parking garage that collapsed after a rainstorm on the Lower East Side at Grand Street and East Broadway.

The Seward Park residential cooperative apartment complex includes four high-rise apartment buildings and dozens of commercial stores, as well as a two-level garage comprised of an underground level and a partial above-ground level for approximately 400 cars. On January 15, 1999, near midnight, the northern portion of the garage collapsed. Two to three feet of soil and a lawn covered the northern portion of the garage, and were used as a park and recreation area for the residents of plaintiff's buildings. There was a system of drainage pipes that directed water absorbed by the soil away from the garage. The south side of the garage which did not collapse had no soil or grass on top, but was paved and used for above-ground parking.

In the week prior to the collapse, almost five inches of rain and freezing rain fell. Several of the drains in the collapsed area were purportedly clogged with ice, dirt and soil. Notably, the garage, constructed in or about 1960, was designed to have supports placed on top of approximately 90 garage columns, known as "capitals." In several places these capitals were missing and this was obvious on visual inspection. The capitals were designed and used to spread the load from the slab supporting the upper level of the garage, and to reduce stresses at the point that the columns met the slab that was the concrete roof of the lower level.

Five days after the collapse, the Department of Buildings (hereinafter referred to as DOB) ordered that the remaining portion of the northern section of the garage be demolished and that the entire garage, including the southern portion, be vacated. On June 24, 1999, DOB ordered that the southern portion of the garage be demolished immediately.

The plaintiff made a claim for the loss with its insurance carrier, the defendant Greater New York Mutual Insurance Company (GNY), under its all-risk, first-party property policy. The claim was denied on December 29, 2000, resulting in this litigation. The defendant denied coverage on the basis of the following exclusions: (1) ordinance or law; (2) hidden or latent defect; and (3) collapse. Given the denial, the plaintiff paid for the construction by obtaining a line of credit from a third party. Reconstruction of the garage commenced in or about June 2001, the underground portion was completed by April 2002, and the above-ground portion completed in October 2003. The plaintiff alleged that the total cost of rebuilding was approximately $19,000,000.

On the eve of trial, in mid-November 2003, plaintiff moved for an order in limine seeking, inter alia, to preclude the defendant from offering evidence that the plaintiff failed to complete the repairs to the garage "as soon as reasonably possible," a requirement of the insurance policy in order to receive damages for "replacement value." The court granted the plaintiff's motion. The defendant filed a notice of appeal and moved for a stay of the trial, which was denied by this Court.

The case was tried from January 29, 2004 through March 29, 2004, when a verdict was rendered. The jury awarded the plaintiff a total of $12,075,503.74 for replacing the garage. Included in the total were certain amounts specified in the verdict sheet as follows:

| | | | |
|---|---|---|---|
| (1) | Pipes, drains and the trench | - | $375,800 |
| (2) | Fences, trees, shrubs and plants on the roof of the garage | - | $164,400 |
| (3) | Roof garden and lawns | - | $204,890 |
| (4) | Interest on the amount withdrawn from $20 million line of credit | - | $641,288.57 |
| (5) | Loss of rental income | - | $269,079.26 |

| | | | |
|---|---|---|---|
| (6) | Paved surfaces, excavations and foundations | - | $851,549.14 |
| (7) | Construction of roof fountain | - | $0 |
| (8) | Lighting inside garage | - | $57,970 |
| (9) | Lighting on roof of garage | - | $28,500 |
| (10) | Play area | - | $28,850 |
| (11) | Architectural and engineering services | - | $750,000 |

The defendant moved for judgment notwithstanding the verdict, which was denied by the trial court. In the judgment entered April 2005, the plaintiff was additionally awarded interest of more than $6 million, which the court determined had accrued on the entire amount commencing August 7, 1999. Thereafter, the defendant paid the judgment instead of filing an appeal bond (since interest was running), reserving its right to recover the judgment on appeal.

On appeal, the defendant contends that any exception to the collapse exclusion, where it is "caused in part" by weight of rain, requires that the weight of rain be the dominant cause of the collapse, rather than simply "a" cause thereof; and, in any event, the damage sustained is excludable as it resulted from a hidden or latent defect.

The defendant also argues that the uncollapsed portion of the garage was not covered under its policy, since it was damaged precollapse, and its destruction was ordered due to construction defects therein; that the plaintiff was not entitled to recover finance charges as an "extra expense" since the "extra expense" provision of the policy was applicable only where the financing resulted in reducing defendant's liability for plaintiff's loss of rents, and that coverage for such charges was not within the contemplation of the parties when the contract was entered.

Further, the defendant claims that it was error for the court to allow plaintiff to recover for the cost of items designated under the policy as "Property Not Covered," and that the prejudgment interest was improperly calculated.

Finally, the defendant contends that its disclaimer of coverage was not the equivalent of a "repudiation" of the insurance contract, and therefore the plaintiff was not excused from compliance with the policy provision requiring the rebuilding of the garage "as soon as reasonably possible."

■ We find that the trial court correctly determined the issue of causation, and also rightly held that the defendant did not make out a case for a hidden or latent defect exclusion. The contract of insurance, under the heading "Additional Coverage-Collapse" provides that a covered cause of loss shall include collapse occurring "after construction, remodeling or renovation is complete and . . . caused in part by [weight of rain] . . . even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse." There is no requirement in the contract that weight of rain be the dominant cause, and clearly the contract could have so stated had that been the intent of the parties. The contract unambiguously provides coverage where "weight of rain" is a partial cause of a collapse, and the trial court, tracking the relevant contract language, properly charged the jury to that effect.

While the defendant argues that the collapse nonetheless fell within the policy's exclusion for "hidden and latent" defects, it failed to satisfy its burden of establishing that the claimed policy exclusion defeats the insured's claim to coverage. Particularly in view of the policy's express provision of coverage for collapses caused, even in part, by "weight of rain," the defendant failed to demonstrate the clear and unmistakable applicability of the relied-upon exclusion. (*See Continental Cas. Co. v Rapid-American Corp.*, 80 NY2d 640, 653 [1993].) Indeed, the applicability of the exclusion would not have been established even if there had been no coverage for weight-of-rain collapses, since defendant utterly failed to support its claim that the defects upon which it *relied were* "hidden and latent." (*See Parente v Bayville Mar.*, 43 AD2d 956 [1974].)

Further, the court's charge regarding ordinance or law coverage was also proper. The policy, read as a whole, provides that where there is a covered cause of loss to building property, the insurer will reimburse the insured "for the loss in value of the undamaged portion of the building as a consequence of the enforcement of any ordinance or law that . . . requires the demolition of parts of the same property not damaged by a Covered Cause of loss."

"Undamaged" as used in this provision refers to a lack of damage from a covered cause of loss. Even if this language were ambiguous, however, the ambiguity would be resolved against defendant insurer. (*See Westview Assoc. v Guaranty Natl. Ins. Co.*, 95 NY2d 334, 339 [2000].)

The trial court also correctly charged the jury that the plaintiff was entitled to reimbursement of the finance charge on

the line of credit used for the rebuilding of the garage. The court specifically and properly charged that, under the terms of the policy the plaintiff was "entitled to recover any extra expense incurred in building the garage, provided that such an extra expense minimized the amount of loss that would otherwise have been payable under the policy." Since the line of credit allowed the plaintiff to rebuild the garage and resume receiving rental income before the outcome of this litigation, it indisputably reduced the plaintiff's loss, and so under terms of the policy minimized the amount payable.

In affirming the finding of defendant's liability for the plaintiff's damages incurred in rebuilding the garage, nevertheless we modify the judgment and vacate the award to the extent that it was based on replacement cost value, and remand for a new trial on the issue of whether plaintiff pursuant to the relevant policy provision rebuilt "as soon as reasonably possible," and therefore whether plaintiff is entitled to replacement cost value or actual cost value. We further vacate in its entirety that part of the award allocated for underground pipes and trenching, for trees, lawns and shrubs, and for excavations and foundations in that damages should be calculated only with respect to paved surfaces and fences affixed to the parking garage itself. Additionally we find that the prejudgment interest on rental losses and the finance charge was erroneously calculated, and remand for a new determination as to a single, reasonable intermediate date from which interest on rental losses and finance charges should be assessed.

The trial court erred in its in limine ruling precluding evidence of the plaintiff's alleged delays in rebuilding the garage. The court erroneously determined that the defendant's disclaimer of coverage amounted to a repudiation of liability, and thus excused the plaintiff from performing on its obligations under the insurance contract.

The particular provision in contention required that the plaintiff rebuild the garage "as soon as reasonably possible" in order to be entitled to the full replacement cost (which is not discounted by depreciation) of the garage, rather than the actual cash value (which is discounted by depreciation). The defendant claims that the issue of the plaintiff's alleged delays, including evidence that the defendant would have presented that the construction delays resulted from the plaintiff's volatile board of directors and political infighting, should have been submitted to the jury as a potential limit of plaintiff's damages.

In a ruling from the bench, the court granted the plaintiff's in limine motion after this on-the-record exchange between counsel for the plaintiff and the court:

> "COUNSEL: The law is clear that if they [GNY] repudiate the contract, they cannot rely on this clause as a sword, keep it alive, keep it on life support . . .

> "THE COURT: The Court concludes that the law of this state is that once the insurance company disclaims, it cannot rely on the failure of the insured to follow through on other requirements in the contract."

The court added, "the insurance company cannot assert the provision barring the plaintiff from relying on the replacement cost of the garage in this case."

On appeal, the plaintiff presses home the point that it was no longer obligated by the policy provisions because of defendant's "repudiation of liability." (*See Beckley v Otsego County Farmers Coop. Fire Ins. Co.*, 3 AD2d 190, 194 [3d Dept 1957], *lv dismissed* 2 NY2d 711 [1957] ["repudiation of liability . . . excuses the insured from further performance . . . of the conditions of the policies"], citing *Sherri v National Sur. Co.*, 243 NY266, 272-273 [1926].)

The defendant, on the other hand, asserts that it was "palpably wrong" of the trial court to endorse the plaintiff's argument that every disclaimer of coverage is a repudiation of the insurance contract, and that a disclaimer does not excuse performance by the plaintiff. We agree with the defendant, and find that both the trial court and the plaintiff erroneously equate "disclaimer of coverage" with "repudiation of liability."

Traditionally, New York courts have been reluctant to find repudiation of liability in insurance cases unless the circumstances conform narrowly to those elucidated in the two aforementioned seminal cases. (*See Igbara Realty Corp. v New York Prop. Ins. Underwriting Assn.*, 63 NY2d 201, 217 [1984], citing *Sherri v National Sur. Co.* and *Beckley v Otsego County Farmers Coop. Fire Ins. Co.*; *see also Lentini Bros. Moving & Stor. Co. v New York Prop. Ins. Underwriting Assn.*, 76 AD2d 759 [1980], *affd* 53 NY2d 835 [1981].)

In *Sherri* (243 NY at 272-273), the Court of Appeals found repudiation in an insurer's letter *immediately* "denying all liability and refusing to pay the loss." In *Beckley*, the Third

Department found repudiation where an insurer suspecting fraud within two days from submission of proofs of loss for a fire caused the insured's arrest for arson.

However, the erroneous, interchangeable use of the terms in the instant case is not unique to this case, nor is it one of recent making. Evidently, litigants and their attorneys have been using the terms synonymously, and thus incorrectly, for some time. (*See Clarke v Fidelity & Cas. Co. of N.Y.*, 55 Misc 2d 327, 330 n 1 [1967, Levy, J.] ["the defendant's action in respect of the (insurance policy) was one of 'repudiation' and 'rescission' of the contract as a whole . . . rather than one of 'disclaimer' or alleged 'lack of coverage' in reliance upon the terms of the contract. *But I have, in this opinion, now and then, used the expressions of the parties as contained in their documents*" (emphasis added)].)[1]

To the extent that we have used the terms interchangeably, we now correct that imprecision. For example, in *438 Manhattan Ave. v Insurance Co. of State of Pa.* (251 AD2d 71, 71 [1998]), we found that the defendant insurance company had made a prima facie case for "its disclaimer of coverage" basing it on a purportedly valid exclusion in the contract. Unfortunately, we concluded, two sentences later, that the insurer was barred from asserting policy language limiting replacement cost by its refusal letter "repudiating the policy." (251 AD2d at 72.)[2]

Since the plaintiff in this case relies heavily on *438 Manhattan*, it is important to make clear, as the defendant urges, that a difference exists between true contractual repudiations—usually called anticipatory breaches—and run-of-the-mill breaches of contract such as those alleged by insureds upon receiving coverage disclaimers. (*See New York Life Ins. Co. v Viglas*, 297 US 672, 681-682 [1936, Cardozo, J.].)

To amplify further, in the words of Justice Cardozo: "The line of division between [an anticipatory breach and others] has not always been preserved with consistency or clearness . . . A loose practice has been growing up whereby the breach . . . is spoken of as anticipatory, whereas in truth it is strictly present." (*Viglas, supra* at 681-682.)

---

**1.** Earlier decisions may be partly to blame since the term "disclaimer of liability" was also used. (*See, Orwat v Aetna Ins. Co.*, 131 Misc 141 [Sup Ct, Erie County 1928]; *Lobdell v Broome County Farmers' Fire Relief Assn.*, 151 Misc 911 [Sup Ct, Broome County 1934].)

**2.** In that case, this Court additionally found that the insurer was barred from limiting replacement cost because of its *"failure to raise the issue promptly."* (*Id.* [emphasis added].) Thus, the labeling error was harmless.

Most recently, this Court aptly relied on the analysis in *Viglas* to hold that repudiation of a policy exists "only where a plaintiff establishes that the insurer has committed an anticipatory breach by 'disclaim[ing] the intention or the duty to shape its conduct in accordance with the provisions of the contract'." (*Wurm v Commercial Ins. Co. of Newark, N.J.*, 308 AD2d 324, 327-328 [2003], *lv denied* 3 NY3d 602 [2004], quoting *New York Life Ins. Co. v Viglas*, 297 US at 676.)

In the instant case, we find that contrary to disclaiming the duty of shaping its conduct in accordance with the provisions of the contract, the defendant insurer, like the insurance company in *Viglas* (*supra* at 676), in fact "appealed to their authority and endeavored to apply them." Far from immediately or summarily rejecting the plaintiff's claim and proofs of loss, it is uncontroverted that the defendant spent the better part of a year on an investigation into the garage collapse, including conducting 10 EBTs into the matter. On December 29, 2000, the defendant sent a letter rejecting the final proof of loss. The seven-page letter detailed the results of the defendant's investigation and explained the denial of coverage with reference to policy provisions and exclusions. In other words, it was an explanation with reference to the terms of the contract.

Consequently, since we find there was no repudiation of the contract, the plaintiff was obligated to comply with the provision of rebuilding "as soon as reasonably possible," and so the award based on replacement cost value is vacated, and the issue is remanded for a new trial and determination as to whether the plaintiff in fact complied with the terms of the contract.

The trial court also improperly charged the jury to consider damages for property specifically not covered by the policy. Covered property includes fixtures to the garage, such as pavement and fences, as indicated by the policy terms. But the relevant provision of the policy stated that,

> "Covered Property does not include: . . .
>
> "d. Bridges, roadways, walks, patios or other paved surfaces; . . .
>
> "f. The cost of excavations, grading, backfilling or filling;
>
> "g. Foundations of buildings;
>
> "h. Land (including land on which the property is located), water, growing crops or lawns; . . .

"k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance; . . .

"m. Underground pipes, flues or drains; . . .

"(2) Fences . . . trees, shrubs or plants . . . all except as provided in the Coverage Extensions."

The defendant asserts that if the court had properly applied the "Property Not Covered" language, the verdict would have been reduced for the underground pipes and trench by $375,800; for trees, fences, lawns and shrubs by $359,290; and for paved surfaces, excavations and foundations by $851,549.14. Defendant claims that the total reduction would be $1,602,639.10, which, with interest on these items, would make the reduction $2.3 million.

This argument has merit. While the "Additional Coverage" for collapse mentions some of the items for which the plaintiff sought reimbursement, the latter provision specifically requires that the property be "Covered Property under this Coverage Form" for it to be applicable. The majority of items, however, are not covered. The only items which appear to be covered are those items actually affixed to the roof of the garage, such as the paving, and any fences attached thereto, since "Covered Property" (such as the garage) is defined in the policy to include "fixtures, including outdoor fixtures." Although the plaintiff argues that the lawn and recreation area were part of the garage, they were simply placed on top of the garage, and were not components thereof.

■ Finally, prejudgment interest was properly charged as of August 7, 1999, with the exception of interest awarded on the damages for rental losses and for the finance charge, which accrued or continued to accrue thereafter. Pursuant to CPLR 5001 (b):

> "Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."

In insurance breach of contract actions, interest is computed from the date of accrual. (*See Brushton-Moira Cent. School Dist. v Thomas Assoc.*, 91 NY2d 256 [1998].) Here, pursuant to the policy, the plaintiff was entitled to payment 30 days after submission of sworn proof of loss, thus the date of accrual was August 7, 1999. By that point, the plaintiff had suffered damages as a result of the collapse and imminent demolition (demolition of the southern portion was ordered by June 1999, and undertaken between August and September 1999), although amounts attributable thereto were not entirely certain. (*See Stanford Sq., L.L.C. v Nomura Asset Capital Corp.*, 232 F Supp 2d 289, 293 [SD NY 2002] [there is no requirement that monetary damages claim be readily ascertainable or liquidated in order to award prejudgment interest]; *see also Ely-Cruikshank Co. v Bank of Montreal*, 81 NY2d 399 [1993] [a claim for breach of contract accrues at the time of breach, even if damages are not sustained until a later date].)

However, the rental losses continued to be incurred after August 7, 1999. Since the rental losses allocated by the jury for 15.8 months[3] were part of the total 12 million dollar-plus amount on which interest was computed, the court erred in determining that interest on the entire rental loss had accrued as of August 7, 1999. Additionally, the "extra expenses," in the nature of finance charges, were not yet incurred as of August 7, 1999. Thus, under CPLR 5001 (b), the date for the allocation of interest on the latter two items should be modified to commence as of a single, reasonable intermediate date.

The defendant's remaining arguments have been considered and found unavailing.

Accordingly, the judgment of the Supreme Court, New York County (Louis B. York, J.), entered April 26, 2005, which, after a jury trial, awarded plaintiff damages, should be modified, on the law, to vacate the award to the extent that it was based on replacement cost value; further to vacate, in the entirety, that part of the award that was allocated for underground pipes and trenching, for trees, fences, lawns and shrubs, for paved surfaces, excavations and foundations, as well as that part of the award that was allocated as interest for the rental losses and on

---

**3.** Interestingly, while the jury was charged with basing a calculation of the rental losses on what it perceived to be a reasonable amount of time for rebuilding the garage, the defendant does not raise any objection, here, to the jury's finding without having had an opportunity to present evidence on what constituted "reasonable time."

the finance charge; and otherwise affirmed, without costs, and the matter remanded for trial on the issue of whether the plaintiff rebuilt the garage pursuant to the policy requirements, "as soon as reasonably possible" thus, as to whether plaintiff's damages were properly awarded on a replacement value basis; and for a recalculation of damages with respect only to paved surfaces and fences affixed to the parking garage itself, and to establish a date (or dates) from which interest on rental losses and the finance charge should be assessed.

MAZZARELLI, J.P., FRIEDMAN, GONZALEZ and MALONE, JJ., concur.

Judgment, Supreme Court, New York County, entered April 26, 2005, modified, on the law, to vacate the award to the extent that it was based on replacement cost value; further to vacate, in the entirety, that part of the award that was allocated for underground pipes and trenching, for trees, fences, lawns and shrubs, for paved surfaces, excavations and foundations, as well as that part of the award that was allocated as interest for the rental losses and on the finance charge; and otherwise affirmed, without costs, and the matter remanded for trial on the issue of whether the plaintiff rebuilt the garage pursuant to the policy requirements, "as soon as reasonably possible" thus, as to whether plaintiff's damages were properly awarded on a replacement value basis; and for a recalculation of damages with respect only to paved surfaces and fences affixed to the parking garage itself, and to establish a date (or dates) from which interest on rental losses and the finance charge should be assessed.